IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND


TOWHEE A. SPARROW, JR.          *
                                *
v.                              *      Civil Action No. WMN-16-1394
                                *
CITY OF ANNAPOLIS (MD) et al. *

    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *

## MEMORANDUM

Before the Court is a Motion for Summary Judgment filed by
Defendants City of Annapolis, Sergeant Christopher Kintop,
Officer Robert Reese, II, and Officer Ralph DeFalco.  ECF No.
24.  Also pending is a motion for leave to file a surreply filed
by Plaintiff Towhee A. Sparrow, Jr.  ECF No. 27.  Both motions
are ripe for decision.  Upon review of the motions and the
applicable case law, the Court determines that no hearing is
necessary, Local Rule 105.6, and that Plaintiff's motion for
leave to file a surreply will be granted in part and denied in
part and Defendants' Motion for Summary Judgment will also be
granted in part and denied in part.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Towhee A. Sparrow, Jr. is an African-American
male who, at the time of the incident giving rise to this
action, was 33 years old.  Plaintiff lives in Prince George's
County, Maryland, but spent the evening of June 5, 2014, working
on his motorcycle on his father's property in Annapolis,

Maryland.  In his deposition, Plaintiff described the following series of events.

At approximately 9:30 that evening, Plaintiff was finishing his work on the motorcycle when he observed an Annapolis Police Department (APD) police car parked near and shining a spotlight on his father's house.  Plaintiff rode his motorcycle towards his father's driveway to investigate.  Before he reached the driveway, an APD police officer, later identified as Defendant Officer Robert Reese, II, pointed his gun at Plaintiff and yelled "get off of the fucking motorcycle," and "get on the fucking ground."  Pl.'s Dep. at 86 (ECF No. 25-1). Startled, Plaintiff accidently hit the gas on the motorcycle and it went five to ten feet forward before stopping about 20 feet from Reese.

Plaintiff got off of the motorcycle and Reese continued to curse at him, telling him to put his hands behind his head and threatened to shoot him if he did not comply.  Plaintiff complied and laid face down on the ground with his hands behind his head but Reese continued to curse at him, telling Plaintiff not to look at him or he would "fucking shoot him."  Reese did not identify himself, explain the reason he was stopping Plaintiff, or ask Plaintiff for his identification, which Plaintiff had on his person.  Confused, Plaintiff tried to explain that this was his father's house and he was there fixing

his motorcycle. Reese told Plaintiff to "shut the fuck up," and called him "Nigger."

Reese then commenced to handcuff Plaintiff behind his back but, before doing so, kicked Plaintiff in the head, causing Plaintiff to briefly lose consciousness. While placing Plaintiff in handcuffs, Reese placed his knee on the back of Plaintiff's neck, bearing down on the base of Plaintiff's skull for a considerable period of time. Reese also raised his knee up several times and slammed it back down on Plaintiff's head and neck several times and also pulled Plaintiff's handcuffed hands up, causing severe pain.

Within a few minutes, more APD police cars and officers arrived, including Defendant Officer Ralph DeFalco and Defendant Sergeant Christopher Kintop. Plaintiff testified that these officers continued the violent assault on him, kicking him and calling him racial slurs. Reese continued to bear down with his knee on Plaintiff's neck and Kintop pulled up on Plaintiff's handcuffed wrists, yelling at Plaintiff, "You think you tough because you pulled your gun out on a white guy." Pl.'s Dep. at 103. Reese then walked a few feet away to "gather [him]self and catch [his] breath." Reese Dep. at 53 (ECF No. 25-4).

Another APD officer, Andrew Stallings, had also arrived at the scene and initiated a search of Plaintiff's person. DeFalco began to press his knee into the back of Plaintiff's neck while

Stallings patted Plaintiff down.  Stallings, who is described by
Reese as being "always hyper," id. at 50, felt Plaintiff's cell
phone in a holder attached to his waist, mistook the phone for a
gun, and began screaming "gun, gun, gun."  In DeFalco's account
given in the internal affairs investigation, DeFalco indicated
that, in response to Stallings' gun announcement, he pulled
Plaintiff's arms up high by the links of the handcuffs "to
inflict a little bit of pain."  Internal Affairs Case File at 7
(ECF No. 25-3).  The officers then pulled Plaintiff's pants down
to his knees or ankles.

Annapolis Fire Marshal Jonas Brooks, who happens to be
Plaintiff's uncle, arrived at the scene several minutes later
and, in a subsequent interview conducted as part of the APD
internal affairs investigation of this incident, stated that he
heard an officer say "shut the fuck up" and call Plaintiff a
"dirt ball" or "shit bag."  Id. at 9.  In their Reply
memorandum, Defendants significantly misrepresent several
aspects of Brooks' statement to the internal affairs
investigator.  They represent in their Reply that "[w]hen Brooks
arrived at Plaintiff's father's residence [], he observed that
Plaintiff was still on his vehicle."  ECF No. 26 at 2 (citing
Audio Recording of Brooks' Interview (ECF No. 24-12)).  Later in
their Reply, they argue that Brooks, "who observed Plaintiff
still on his motorcycle when he pulled up to the scene, stated

that he did not observe any officer striking, kicking, punching, or otherwise assaulting Plaintiff." Id. at 17 (emphasis added). In his interview, however, Brooks clearly stated that he was the fifth or sixth officer on the scene and, that by the time he arrived, Plaintiff was face down on the ground, being held at gunpoint. Brooks also stated that there were so many cars already there and he had to park two houses down from where Plaintiff was being detained.

Defendants may also have similarly misrepresented the time at which Plaintiff's father arrived at the scene. In their Reply, Defendants represent that "objective witness Mr. Sparrow, Sr., who came outside while Plaintiff was being patted down, only observed physical contact in the form of Plaintiff's handcuffs being pulled up by Defalco. Defalco did this in response to the gun announcement, which is when Plaintiff alleges he was being kicked by six officers at once." Id. at 17. Mr. Sparrow, Sr., testified, however, that when he first saw his son, Plaintiff's pants were already pulled down to his knees. Sparrow, Sr., Dep. at 18 (ECF No. 25-2). If Plaintiff's pants were already at his knees, this was after the pat down and mistaken identification of Plaintiff's cell phone as a gun, given that it is undisputed that the cell phone was holstered to Plaintiff's waist.

After a few more minutes, another APD police car arrived and Kintop picked up Plaintiff and pulled him over to the car. Three individuals got out of the car, looked at Plaintiff, and stated that Plaintiff looked nothing like the man that had threatened them with a gun earlier in the evening.  Kintop then introduced himself to Plaintiff and told Plaintiff he had just been "in the wrong place at the wrong time."  Pl.'s Dep. at 104. After a brief delay while the officers tried to find the keys to the handcuffs, the handcuffs were removed.  Plaintiff then learned what had instigated his frightening and painful ordeal.

About an hour earlier, APD had received reports that a young, tall, thin, Hispanic or Asian male riding a blue and white dirt bike had brandished a handgun and threatened several individuals in the parking lot of a nearby Giant Food store.  In response, APD officers, including Reese, began canvasing the area for the suspect.  Ironically, Plaintiff was familiar with the individual described by the witnesses and was able to direct the officers to his home.  That individual was subsequently arrested and charged with first degree assault.

Plaintiff has testified that, as a result of his "being in the wrong place at the wrong time," and being mistaken by Reese for the suspect, he sustained serious physical and emotional injuries.  Plaintiff's father observed that, after the handcuffs were removed, Plaintiff's wrists were bleeding and he had a

bruise on his neck.  When he asked his son if he wanted to go to the hospital, Plaintiff responded that he just wanted to get out of Annapolis.  Plaintiff's father added that, since this incident, Plaintiff tries not to be in Annapolis after dark. Sparrow, Sr., Dep. at 25.  The next day, Plaintiff reported to his father that his head and arms were hurting him.  Id.

Plaintiff went to the Prince George's Hospital Emergency Department the next day, complaining of "fever and pain in the shoulder, left side of the ribs, and back of head" that resulted from a fight the day before.  Prince George's Hospital Emergency Record dated June 6, 2014, at 9 (ECF No. 25-10).  Plaintiff left before receiving treatment, however, due to an inordinate wait time in the emergency department.  Plaintiff returned the next day, complaining of "severe headache fever and bruising." Prince George's Hospital Emergency Record dated June 7, 2014, at 9 (ECF No. 25-11).  Plaintiff again left without being treated because of the inordinate wait.

On June 13, 2014, Plaintiff went to the Emergency Department of Southern Maryland Hospital Center (SMHC) complaining of headaches, blurred vision, left ear pain, and intermittent left thumb numbness after being "punched in the head" one week before. SMHC Emergency Dept. Chart dated June 13, 2014, at 1 (ECF No. 25-13).  On July 1, 2014, Plaintiff went to the Annapolis Ear, Nose, Throat, and Allergy Associates complaining of left ear pain,

posterior neck pain, chest pain as well as tinnitus. Dr. Gregory

Heacock Letter dated July 1, 2014 (ECF No. 25-14). On April 8,

2016, Plaintiff saw Dr. Maciej Poltorak at Neurological Medicine,

P.A. in Greenbelt, Maryland, again with complaints of headaches.

Dr. Poltorak noted that:

> The patient is a 35 year old male who presents with a
> complaint of Headache. Note for "Headache": Reason
> for Visit/Chief Complaint: The patient is a very
> pleasant young man who has severe headaches and what
> he described migraine. . . They are very frequent,
> almost each day. This started two years ago in June
> 2014, he was severely assaulted by a police officer
> when they kicked him on the head and back. He had
> broken ribs and loss of consciousness. The assault
> lasted one hour, but his loss of consciousness was
> short. He also has injury to the hands when he was
> handcuffed behind his back. Since then, these
> headaches started; before that he was very healthy . .
> . . He has ringing in the ear, sensation of spinning
> or constant unsteadiness with feeling lightheaded on
> and off . . . . His headache is very severe in the
> frontal and bitemporal area. He also has hand pain
> after the handcuffing and he was evaluated for that
> too. He felt nervous and tense.

Report of Neurological Medicine, Inc. dated April 8, 2016, at 1

(ECF No. 25-16). Dr. Poltorak's impression was that "[t]he patient

has significant headaches status post head injury. Most likely, he

has postconcussion syndrome. Id. at 3. Plaintiff had a follow-up

appointment with Dr. Poltorak on August 16, 2016, in which Dr.

Poltorak noted that Plaintiff's "cognitive evaluation indeed showed

some cognitive deficit. His MCI probability was 90%, which is

quite obvious with marked impairment of both memory and executive

function, and fluency. . . . Since he is 35 years old, I think it

will be important for him to start some therapy." Report of
Neurological Medicine, Inc. dated August 16, 2016, at 1 (ECF No.
25-18). Dr. Poltorak also noted that the "MRI of the brain did
show some mild white matter changes," although they were
"nonspecific." Id.

Plaintiff has also sought treatment for the injuries to his
wrists. On July 16, 2014, Plaintiff went to the Annapolis Hand
Center complaining of acute pain, numbness, and tingling in his
hands. He was seen there by Dr. Thomas Dennis who concluded that
Plaintiff has "traumatic carpal tunnel syndrome." Clinical
Encounter Summary of Dr. Dennis dated July 16, 2014, ECF No. 25-20.
On March 27, 2015, Plaintiff went to Oxen Hill Orthopaedics
complaining of pain, numbness, and tingling in both wrists and
hands since June 2014 and was diagnosed with "bilateral carpal
tunnel syndrome." Report of Oxon Hill Orthopaedics dated March 27,
2015 (ECF No. 25-21). On June 8, 2015, Plaintiff was seen at the
National Spine and Pain Centers, was diagnosed with moderate right-
sided carpel tunnel syndrome and a surgical decompression of the
right wrist was recommended. Dr. Arthur Barletta Letter dated June
8, 2015 (ECF No. 25-22). Plaintiff underwent carpel tunnel surgery
on his right hand on January 24, 2017, and on his left hand on
March 20, 2017.

Plaintiff filed his original complaint in this action on May
10, 2016, and an Amended Complaint on October 27, 2016. In Count I
of the Amended Complaint, Plaintiff asserts a claim under 42 U.S.C.

§ 1983 against the City of Annapolis and Kintop, Reese, and DeFalco in their official capacities.  Plaintiff asserts that the individual defendants violated his right under the Fourth Amendment to not be subjected to the use of excessive force.  Plaintiff brings a claim against the City of Annapolis under <u>Monell v. Department of Social Services</u>, 436 U.S. 658 (1978), asserting that this violation resulted from a policy, practice, and custom of the City of Annapolis of using excessive force when seizing suspects. Counts II through IV assert excessive force claims against Kintop, Reese, and DeFalco in their individual capacities.  Counts V and VI assert claims against all defendants under Articles 24 and 26 of the Maryland Declaration of Rights, respectively, with the liability of the City of Annapolis being premised on the doctrine of <u>respondeat superior</u>.  Count VII asserts a claim of battery against the three individual defendants and Count VIII asserts a claim of false imprisonment against those same three defendants. Defendants have moved for summary judgment as to all eight counts.

## II. LEGAL STANDARD

Under Rule 56, the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In considering the motion, the judge's function is "not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  <u>Anderson v. Liberty Lobby, Inc.</u>,

477 U.S. 242, 249 (1986).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id. at 248.  In ruling on a motion for summary judgment, the Court must "view the evidence in the light most favorable to . . . the nonmovant and draw all reasonable inferences in [his] favor."  Dennis v. Columbia Colleton Med. Ctr., Inc., 290 F.3d 639, 645 (4th Cir. 2002).

## III. DISCUSSION

### A. Plaintiff's Motion for Leave to File Surreply

The Court will first address Plaintiff's motion for leave to file a surreply.  Plaintiff submitted with his Opposition to Defendants' Motion for Summary Judgment motion two reports from his expert witness, William T. Gaut.  ECF Nos. 25-26 and 25-27. In their Reply, Defendants argue that those expert reports should not be considered by the Court for purposes of their Motion for Summary Judgment because the reports were unsworn. ECF No. 26 at 5.  Without conceding that Defendants' objection to the reports was meritorious, Plaintiff filed his motion for leave to file a surreply for the purpose of supporting his expert's reports with a verifying affidavit.  Defendants opposed the motion arguing that, because Plaintiff was not responding to any new legal issues or legal theories presented in Defendants' reply, a surreply was not permissible.

The Court will permit the submission of Gaut's verifying affidavit, although it is questionable if this submission actually constitutes the submission of a "surreply." The Fourth Circuit recently addressed a similar procedural situation in Humphrey & Partners Architects, L.P. v. Lessard Design, Inc., 790 F.3d 532 (4th Cir. 2015). In Humphrey & Partners, the plaintiff moved to strike expert reports submitted by the defendants in support of a cross motion for summary judgment on the ground that the reports were inadmissible hearsay. In response, the defendants submitted declarations from the experts verifying the contents of their reports and stating that they would testify at trial to the substance thereof. The district court denied the plaintiff's motion to strike, reasoning that the declarations, although belated, cured the plaintiff's objections. 790 F.3d at 536.

On appeal, the plaintiff argued that the district court erred in considering the expert reports. The Fourth Circuit rejected that argument and held that the "district court acted within its discretion when considering the expert reports because those reports were both sworn to in declarations filed in response to [the plaintiff's] objection and the content of the reports would be admissible through the expert's testimony at trial." Id. at 538 (internal quotation omitted). The court reasoned,

the admissibility of the reports themselves is
immaterial because [the defendants] explained the
admissible form that is anticipated.  [The defendants]
submitted declarations made "under penalty of perjury"
from the experts attesting that they would testify to
the matters set forth in their respective reports.
And subsequent verification or reaffirmation of an
unsworn expert's report, either by affidavit or
deposition, allows the court to consider the unsworn
expert's report on a motion for summary judgment.

Id. at 539 (internal quotation omitted).  The same holds true

here.[1]

In the proposed surreply, Plaintiff also raised a second

issue in a single sentence: "In addition, Plaintiff objects to

the Affidavit of Charles J. Key, Sr., attached as Exhibit 12 to

Defendants' Reply Brief, because it is an untimely filed expert

report and because it does not meet the requirements of Rule

56(c)(4)."  ECF No. 27-1.  Defendants note in opposing the

motion for leave to file a surreply that Plaintiff fails to

explain why Key's affidavit is untimely or out of compliance

with Rule 56(c)(4). Plaintiff did not file a reply to provide

that explanation and, therefore, in the absence of any further

explanation, the Court will deny that aspect of Plaintiff's

motion.

---

[1] The Court notes that Defendants were not in any way prejudiced
by the delayed verification of Gaut's reports in that they
responded at length to his reports in their Reply.  ECF No. 26
at 5-7.

## B. False Imprisonment Claim

Turning to Defendants' Motion for Summary Judgment, the Court will first address the claim for false imprisonment. The elements of the tort of false imprisonment are the following: 1) the deprivation of the liberty of another; 2) without consent; and 3) without legal justification. Montgomery Ward v. Wilson, 664 A.2d 916, 925 (Md. 1995). It is undisputed that Plaintiff was deprived of liberty without his consent. As to the final element, "[a] police officer has legal justification to make a warrantless arrest where he has probable cause to believe that a felony has been committed, and that the arrestee perpetrated the offense." Ashton v. Brown, 660 A.2d 447, 472 (Md. 1995).

In moving for summary judgment on this claim, Defendants take the position that, because "it is undisputed that Reese was the one to apply the handcuffs," and Kintop and DeFalco did not arrive at the scene until after Plaintiff was already handcuffed by Reese, Kintop and DeFalco cannot be liable for the tort of false imprisonment. The Court notes that in the statement Reese gave right after the incident, Police Report dated June 5, 2014 (ECF No. 24-7), and in his deposition, Reese Dep. at 35 (ECF No. 24-5), he stated that he was the one that placed Plaintiff in handcuffs. In the interview Reese gave in September of 2014 as part of the internal affairs investigation, however, he stated that he stood 10 to 12 yards away while Stallings placed

Plaintiff in handcuffs. Audio Recording of Reese Interview on
Sept. 16, 2014 (ECF No. 24-13). This discrepancy is not
relevant to the issue of the liability of Kintop or DeFalco for
false imprisonment since, whether it was Reese or Stallings who
placed Plaintiff in handcuffs, and not Kintop or DeFalco, Kintop
and DeFalco cannot be held liable for false imprisonment. The
discrepancy, however, does serve to undermine the credibility of
Reese's recollection of the events.[2]

Assuming that it was Reese that handcuffed Plaintiff, to
establish that he had probable cause to do so, Reese "must point
to specific and articulable facts which, taken together with
rational inferences from those facts, reasonably warranted the
intrusion." Bailey v. State, 987 A.2d 72, 87 (Md. 2010)
(internal quotation omitted). Here, Reese was responding to a
call that a Hispanic or Asian male on a blue and white dirt bike
was threatening individuals with a handgun. It is undisputed
that this conduct constituted a felony - first degree assault.
Reese states that, while he was canvasing the nearby area, he
was approached by a vehicle and the occupant of the vehicle told

[2] In his Opposition, Plaintiff does not respond to Defendants'
argument regarding the liability of Kintop and DeFalco for false
imprisonment. Thus, the Court concludes that Plaintiff has
abandoned those claims. See Grant-Fletcher v. McMullen & Drury,
P.A., 964 F. Supp. 2d 514, 526 (D. Md. 2013) (summary judgment
proper where non-movant abandoned claim by failing to address
movant's arguments).

Reese that he had just seen a man on a dirt bike come out of Chesapeake Harbor Drive onto Edgewood Road but, when the man on the dirt bike saw Reese in his marked patrol car, the man turned back down Chesapeake Harbor Drive. Reese turned down Chesapeake Harbor Drive and, when he arrived near Plaintiff's father's house, he saw a single headlight coming out of the woods which turned out to be Plaintiff's motorcycle. Under the circumstances that existed at that point in time, a jury could conclude that it was reasonable for Reese to detain Plaintiff until it could be determined if he was the individual who had brandished the gun.

In Defendants' Motion, they argue that, at this point in time, "Reese saw a male on a dirt bike who fit the description of the man officers were seeking [and he] illuminated his patrol vehicle's take down lights for visibility purposes." ECF No. 24 at 4. Plaintiff, however, points to the considerable differences between his physical appearance and vehicle and the suspect's reported physical appearance and vehicle. The police radio transmissions that Reese could have heard indicated that the suspect was a tall Hispanic or Asian male wearing a black or blue hoodie and jeans, riding a blue and white dirt bike. Plaintiff, in contrast, is a short African American male who was riding a yellow motorcycle. Once Reese turned his take down

lights on Plaintiff, Plaintiff argues he should have known that Plaintiff was not the individual that was being pursued.

Defendants argue in their Reply that there is no evidence that Reese heard all of the transmissions describing the suspect and that, even if he had, those transmissions were inconsistent. ECF No. 26 at 9-10. The Court notes that in Reese's statement given as part of the internal affairs investigation, he does not claim that he did not hear the suspect's description. Instead, he states that Plaintiff "fit the description" of the individual he was looking for, but he described the suspect as a "number one male wearing a grey sweatshirt" on a "yellow dirt bike." Defs.' Ex. 12. The Court understands "number one male" to be police terminology for a black male. While that description might help Reese justify his detention of Plaintiff, that description is not consistent with the description broadcast on the police radio transmissions.

In addition to his argument that he did not fit the description of the suspect, Plaintiff suggests that, because the initiating incident occurred almost a mile away and almost an hour before Reese detained Plaintiff, the alleged criminal activity "was remote and had grown stale." ECF No. 25 at 31-32. This argument carries little weight. A review of the police radio transmissions from the time of the incident on the Giant Food parking lot until the time that Reese confronted Plaintiff

reveals that there was an active, ongoing search for the suspect, a search that was clearly moving in the direction of where Plaintiff was confronted.  Police Radio Transmissions (ECF No. 24-8).

The Court acknowledges that a jury could find that Reese's detention of Plaintiff was reasonable.  A dirt bike and a motorcycle are not vastly different and Plaintiff was riding out of the woods near where it was believed the suspect had fled. It is also not clear how much of the police radio transmissions Reese actually heard.  Reese could have had a good faith and reasonable belief that Plaintiff was the suspect he was looking for.  Nevertheless, "[g]enerally, issues of good faith and reasonable belief are factual questions not suitable for resolution on summary judgment."  Dett v. State, 869 A.2d 420, 432 (Md. Ct. Spec. App. 2005) (reversing the trial court's granting of summary judgment on a false imprisonment claim). The Court will deny Defendants' Motion as to the false imprisonment against Defendant Reese, but will grant it as to Defendants Kintop and DeFalco.

### C. Excessive Force Claims

Similar to the argument Defendants raised regarding the false imprisonment claim, Defendants posit that, since Kintop and DeFalco did not arrive at the scene until after Plaintiff was handcuffed, they cannot be held liable under the Fourth

Amendment for an excessive force claim.  In Defendants' view,
once the initial decision to retain an individual is made, any
subsequent use of excessive force would be governed by the
Fourteenth Amendment's Due Process Clause and not the Fourth
Amendment.  ECF No. 24 at 17 (citing Orem v. Rephann, 523 F.3d
442 (4th Cir. 2008) and Robles v. Prince Georges County,
Maryland, 302 F.3d 262 (4th Cir. 2002)).  The Court finds this
argument unpersuasive.

The Fourth Circuit in Orem did hold that "[t]he Fourth
Amendment only governs claims of excessive force during the
course of an arrest, investigatory stop, or other 'seizure' of a
person.  Whereas, excessive force claims of a pretrial detainee
[or arrestee] are governed by the Due Process Clause of the
Fourteenth Amendment."  523 F.3d at 446 (internal quotation
omitted).  The Fourth Circuit also noted, however, that the
"point at which Fourth Amendment protections end and Fourteenth
Amendment protections begin is often murky."  Id.  In the
particular case before it, the court in Orem held that the
plaintiff's excessive force claim, which arose out of her
treatment during her post-arrest transport to jail, was governed
by the Fourteenth Amendment.  Id.

In Robles, the other Fourth Circuit case on which
Defendants rely, the plaintiff was arrested in Prince George's
County on an outstanding warrant issued by Montgomery County.

19

The arresting officers, after unsuccessful efforts to arrange for the transfer of custody to the Montgomery County Police Department, transported the plaintiff to an empty parking lot in Montgomery County, handcuffed him to a metal pole, and called the Montgomery County Police and told them where to pick up the arrestee. The Fourth Circuit held that this post-arrest conduct was governed by the Fourteenth Amendment.

Here, Plaintiff's claims against the officers are more akin to the excessive force claim raised in Young v. Prince George's County, Maryland, 355 F.3d 751 (4th Cir. 2004). In Young, the plaintiff was pulled over in a traffic stop for not having operable tail lights on a trailer he was pulling behind his truck. After the plaintiff informed the officer that he was an FBI agent and was armed, the officer handcuffed him, threw him on the ground, searched him, retrieved the handgun, and then struck the plaintiff in the back of his neck with his forearm. When the plaintiff complained of this treatment, the officer told him to shut up and pounded his knee into the plaintiff's back. The plaintiff suffered "a contusion, cut to his lips, bruises, lesions to his wrist, and a strained neck and back." 355 F.3d at 754. After the officer confirmed the plaintiff's status as an FBI agent, he was released, his detention lasting less than twenty-five minutes. The district court granted summary judgment on the plaintiff's excessive force claim after

evaluating the claim under the Due Process Clause of the
Fourteenth Amendment, which requires a plaintiff to show that
the defendant "inflicted unnecessary and wanton pain and
suffering." Id. at 758. The Fourth Circuit reversed that
ruling, holding that this conduct which took place during the
course of this investigatory stop was governed by the Fourth
Amendment's objective reasonableness standard. Id. Similarly,
this Court concludes that Plaintiff's excessive force claims
against all three individual Defendants are governed by the
Fourth Amendment.

Under the Fourth Amendment, a court assessing the
reasonableness of an officer's exertion of force must consider
three factors: (1) "the severity of the crime at issue," (2)
"whether the suspect poses an immediate threat to the safety of
the officers or others," and (3) "whether [the suspect] is
actively resisting arrest or attempting to evade arrest by
flight." Graham v. Connor, 490 U.S. 386, 742 (1989). The
Fourth Circuit has added a fourth factor, the extent of the
suspect's injury. Jones v. Buchanan, 325 F.3d 520, 527 (4th
Cir. 2003).

In moving for summary judgment on Plaintiff's excessive
force claims, Defendants argue that, even if they did violate
Plaintiff's Fourth Amendment right to be free from excessive
force, to the extent that they did, they are entitled to

qualified immunity as to those claims.  Qualified immunity

shields law enforcement officers from liability for conduct that

"does not violate clearly established statutory or

constitutional rights of which a reasonable person would have

known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  To

determine whether an officer is entitled to summary judgment on

the basis of qualified immunity, courts turn to a two-pronged

inquiry.  The first prong asks whether the facts show that, in a

light most favorable to Plaintiff, the officer's conduct

violated a federal right.  See, Saucier v. Katz, 533 U.S. 194,

201 (2001).  The second prong asks whether the right was clearly

established at the time the violation occurred, such that a

reasonable person would have known that his conduct was

unconstitutional.  See, Ridpath v. Board of Governors Marshall

Univ., 447 F.3d 292, 306 (4th Cir. 2006).

If Defendants' interactions with Plaintiff on the night of

June 5, 2014, were as Plaintiff describes, there is no question

that a jury could find that each of the officers violated

Plaintiff's right to not be subjected to the use of excessive

force and that they are not protected by the doctrine of

qualified immunity.[3]  At the beginning of the interaction, if it

---

[3] Although Defendants did not submit to the Court the report of
their expert witness, Charles Key, Plaintiff's expert quoted Key
as stating, "[i]f plaintiff's version is correct, the use of
force was not objectively reasonable and not consistent with

was believed that Plaintiff had committed a first degree assault and was armed, it would have been reasonable for Reese to draw his service weapon, to instruct Plaintiff to get down on the ground and handcuff him. While Defendants argue in their motion that Reese "could reasonably conclude that Plaintiff was attempting to flee or cause injury at the moment," ECF No. 24-1 at 21, in his statement to the internal affairs investigator, Reese acknowledged the Plaintiff was completely cooperative from the beginning of the encounter:

> I told him, sir, put your hands up, he listened. Get off the dirt bike, he dropped the dirt bike. I said get on the ground and he got on the ground . . . I told him to spread his arms out and face away from me and he faced away from me . . . . He followed everything that I said.

Audio Recording of Reese Interview on Sept. 16, 2014 (ECF No. 24-13).[4]

In light of Plaintiff's complete cooperation from the very beginning of the interaction, the court cannot conclude, as a

---

accepted standards of police practices." Gaut Suppl. Report dated Jan. 12, 2017, at 9 (ECF No. 24-18). Defendants do not challenge that this is an accurate quotation of their own expert.

[4] To imply that Plaintiff was somehow uncooperative, Defendants in their motion state that "[w]hile Plaintiff ultimately complied with Ofc. Reese's orders to get off his vehicle and lay on the ground, it was only after Ofc. Reese displayed his service weapon." ECF No. 24-1 at 20 (citing Reese Dep. at 37). In Reese's statement to the internal affairs investigator, however, Reese stated that he pointed his service weapon at Plaintiff before giving him any orders.

matter of law, that the subsequent force that Plaintiff states was used against him was reasonable.  See Young, 355 F.3d at 757 (vacating district court's grant of summary judgment on excessive force claim premised on police conduct similar to that alleged by Plaintiff here).  Furthermore, Stallings' false alarm that he felt a handgun does not justify, as a matter of law, the officer's infliction of additional pain on Plaintiff.  As the Fourth Circuit has noted, "[t]he fact that a suspect is armed, however, does not render all force used by an officer reasonable.  The measures taken by an officer to disarm a suspect must be reasonable under the totality of the circumstances."  Id. at 757.

Defendants acknowledge in their motion that "it is inappropriate for a court to grant summary judgment for an excessive force claim when there are disputes regarding the degree, or existence, of the alleged use of excessive force."  ECF No. 24-1 at 18 (citing Young); see also, Meyers v. Baltimore Cty, 713 F.3d 723, 733 (4th Cir. 2013) ("Although a jury ultimately may find that the officers' version of the events is more credible, we are not permitted to make such credibility determinations when considering whether a police officer properly was held immune from suit under the doctrine of qualified immunity.").  Nevertheless, Defendants suggest the Court should give no weight to Plaintiff's "self-serving statements" "when the record blatantly contradicts his

account," citing Scott v. Harris, 550 U.S. 372, 380 (2007). Scott was a case where a videotape capturing the events in question clearly contradicted the version of the story told by the plaintiff such that no reasonable jury could believe the plaintiff's version. 550 U.S. at 380-82. There is no similar evidence here. While there may be some minor inconsistencies in Plaintiff's recounting of the events, so there are in Reese's account, as noted above.

Defendants particularly challenge the adequacy of the evidence that Defendant Kintop had any physical contact with Plaintiff, suggesting that Kintop did not arrive at the scene until after the excessive force alleged by Plaintiff had taken place. ECF No. 26 at 16. They base this conclusion on the testimony of Plaintiff's father that, when he came out of his house to investigate, there were four officers on the scene, three in the yard and one on the street. Because it is undisputed that Reese, Stallings, DeFalco, and Brooks were the first four on the scene, Kintop could not have arrived until after Plaintiff's father was on the scene. Plaintiff's father testified, however, that he thought that there were four officers, Sparrow, Sr., Dep at 15, but he also testified that he did not get a good look at the officers and he was upset. Id. at 17.

Defendants also argue that Plaintiff misidentified Kintop as the officer who pulled up his arms while saying, "you think you are tough because you pulled your gun on a white guy." ECF No. 26 at 15. Plaintiff testified that he could identify Kintop because he

"kneeled down and said that to [his] face," and then later identified himself "when they finally took the cuffs off at the end." Pl.'s Dep. at 103-04. In the Opposition, Plaintiff's counsel misquoted that testimony as Plaintiff stating that Kintop took off the handcuffs. ECF No. 25 at 26. Quoting the Opposition, but not Plaintiff's actual testimony, Defendants then suggest that Plaintiff's testimony is contradictory in that Plaintiff testified elsewhere that it was Reese who removed the handcuffs. ECF No. 26 at 16 (citing Pl.'s Dep. at 157). In the testimony itself, however, there is no contradiction.

As to the fourth factor to be considered in an excessive force claim - the extent of the suspect's injury - Defendants declare in their motion that "[t]he evidence in the record establishes that Plaintiff did not receive the injuries he is now claiming he received." ECF No. 24-1 at 18. They cite no positive evidence in support of that declaration, however.[5] Later in their motion, Defendants hypothesize with absolutely no medical support that "Plaintiff's carpel tunnel syndrome is a result of riding

---

[5] Defendant did submit with their Reply medical records from May and November of 2015 and in which it was recorded that Plaintiff "[c]omplain[ed] of headache without cause or trigger. No history of head injury," and of wrist and hand pain where he "doesn't recall trauma." ECF No. 26 at 3-4 (citing ECF Nos. 26-3, 26-6, and 26-7). These medical records somewhat undermine the strength of Plaintiff's claims, but not to the degree that a jury could not find that Plaintiff's injuries were caused by Defendants' conduct.

and working on motorized vehicles all of his life to include motorcycles, dirt bikes, and four wheelers." Id. at 23.

Viewing the evidence in the light most favorable to Plaintiff as the non-moving party, the Court finds more than sufficient evidence in the record from which a jury could conclude that Plaintiff's wrist and head injuries were the result of the actions of Defendant Officers.

Accordingly, the Court will deny Defendants' motion as to Plaintiff's Fourth Amendment excessive force claims under § 1983 against Reese, Kintop, and DeFalco, Counts II to IV. Because Maryland courts have held that the standards for analyzing claims of excessive force under Articles 24 and 26 of the Maryland Declaration of Rights are the same as the standard for such claims under the Fourth Amendment, Smith v. Bortner, 998 A.2d 369, 375 (Md. Ct. Spec. App. 2010), the Court will deny Defendants' motion for summary judgment as to Counts V and VI as well.

### D. Battery Claims

Although the right to take police action includes a qualified privilege to use force, "if an officer uses excessive force, or force greater than is reasonably necessary under the circumstances, the . . . officer's nonprivileged use of force constitutes battery." French v. Hines, 957 A.2d 1000, 1037 (Md. Ct. Spec. App. 2008). Because the Court concludes that a jury

could find Defendants' use of force was excessive, Plaintiff's battery claim can also go forward.

### E. Monell Claim Against the City of Annapolis

The City of Annapolis, as a unit of local government, is a person subject to suit under 42 U.S.C. § 1983.  Monell, 436 U.S. at 690-91.  Local government liability under § 1983, however, cannot be based on ordinary principles of respondeat superior. Instead, a municipality's liability under Monell "arises only where the constitutionally offensive actions of employees are taken in furtherance of some municipal 'policy or custom.'" Walker v. Prince George's Cty., Md., 575 F.3d 426, 431 (4th Cir. 2009).  Thus, a Monell claim is a form of § 1983 action under which a municipality, such as the City of Annapolis, is liable "where a policymaker officially promulgates or sanctions an unconstitutional law, or where the municipality is deliberately indifferent to the development of an unconstitutional custom." Smith v. Ray, 409 F. App'x. 641, 651 (4th Cir. 2011).  The government's policy or custom must have "played a part in the deprivation" underpinning the plaintiff's claim.  DiPino v. Davis, 729 A.2d 354, 369 (Md. 1999).  The policy or custom may be "an express policy, such as a written ordinance or regulation"; a decision by "a person with final policymaking authority;" "an omission, such as a failure to properly train officers, that manifest[s] deliberate indifference to the rights

of citizens;" or "a practice that is so persistent and widespread as to constitute a custom or usage with the force of law." Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 2003) (internal quotation omitted).

To establish a Monell claim, a plaintiff must prove that "(1) the municipality [had] actual or constructive knowledge of the custom and usage by its responsible policymakers, and (2) there [was] a failure by those policymakers, as a matter of specific intent or deliberate indifference, to correct or terminate the improper custom and usage." Randall v. Prince George's Cty., Md., 302 F.3d 188, 210 (4th Cir. 2002) (internal quotation omitted). The plaintiff also must establish that there was "a 'direct causal link' between the policy or custom and the deprivation of rights." City of Canton, Ohio v. Harris, 489 U.S. 378, 386-86 (1989). Notably, "'there must be numerous particular instances of unconstitutional conduct in order to establish a custom or practice,'" because "[a] municipality is not liable for mere 'isolated incidents of unconstitutional conduct by subordinate employees.'" Smith, 409 F. App'x. at 651 (quoting Lytle, 326 F.3d at 473).

The Supreme Court has explained the reason for this high standard of proof:

> [t]o adopt lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983. In virtually every instance where a

> person has had his or her constitutional rights
> violated by a city employee, a § 1983 plaintiff will
> be able to point to something the city "could have
> done" to prevent the unfortunate incident.  Thus,
> permitting cases against cities for their "failure to
> train" employees to go forward under § 1983 on a
> lesser standard of fault would result in de facto
> respondeat superior liability on municipalities....

City of Canton, 489 U.S. at 391-92; see also Board of Cty.

Comm'rs of Bryan Cty. v. Brown, 520 U.S. 397, 415 (1997) ("Where

a court fails to adhere to rigorous requirements of culpability

and causation, municipal liability collapses into respondeat

superior liability."). On the other hand, the Fourth Circuit

has cautioned that "there is concern that actual municipal

culpability in these matters should not be masked and final

responsibility avoided by overly rigid interpretations and

applications of the concepts of policy or custom, policymaking

authority, and causation.  Spell v. McDaniel, 824 F.2d 1380,

1388 (4th Cir. 1987) (citing City of Oklahoma City v. Tuttle,

471 U.S. 808, 833 n.8 (1985)).

In his attempt to establish a Monell claim, Plaintiff

relies almost exclusively on the reports of his expert witness,

William Gaut. Gaut bases his opinion that the City of Annapolis

is liable under Monell primarily on the number of previous

complaints of officer misconduct and lawsuits filed against the

APD.  In his Preliminary Report, Gaut states that for the three

year period from 2012-14, "APD records show fifty-three (53)

complaints of officer misconduct filed against APD officers, of which [nineteen] (19) (36%) were complaints of excessive force." ECF No. 25-27 at 20. He then opines that, "[f]or a medium or large department, those numbers would not be significant," but they would be for a department the size of the APD which employs 119 sworn officers. Id.[6] He then declares that "of the fifty-three complaints of police misconduct, twenty-four (24) or 45% were sustained," id., but he nowhere explains how he reached that conclusion. In his Preliminary Report, Gaut also points to three civil suits referenced in the Complaint that predate this incident and where claims of excessive force were brought against officers of the APD. Id. at 22-23 and n.28 (citing Complaint ¶¶ 48-55).

In a Supplemental Report dated January 12, 2017, Gaut states that he looked at data from the years 2014 to 2016 and reports: 53 complaints of police misconduct in 2014, of which 24 were sustained;[7] 26 complaints of police misconduct in 2015, of which 10 were sustained; and 40 complaints of police misconduct in 2016, of which 6 were sustained. ECF No. 24-18 at 2. Gaut found it particularly significant that at least 50% of the complaints in each of those three years were "internally" initiated, i.e., they

_____

[6] Gaut does not explain how large a police department must be before he would consider it a medium-sized department and he would then consider this number of complaints insignificant.

[7] Given that in his Preliminary Report Gaut stated that there were 53 complaints of misconduct, of which 24 were sustained in the three year period from 2012 to 2014, it appears that he mistakenly attributed that three year total to the year 2014.

were complaints about the conduct of police officers made by other police officers.  Id.  He also finds it particularly significant that in 2013 there were 4 "Illegal Stop/Detention/Arrest Complaints" and in 2014 there were 3 "Illegal Stop/Detention/Arrest Complaints."  Id. at 3.  In his Supplemental Report Gaut notes that there were nine lawsuits against the APD in the four years preceding the incident giving rise to this action, including an action brought by four officers of the APD alleging racial discrimination.  Id.[8]

In response to Gaut's reports, Defendants note that while there were 19 excessive force complaints in 2012 to 2014, only one of those complaints resulted in a sustained finding.  Defs.' Suppl. Ans. to Interrog. at 7-8 (ECF No. 24-19).  In the five year period from 2009 to 2014, there were 27 excessive force claims, but only two sustained.  Id.  Of the excessive force claims over the seven year period that were internally filed, i.e., those that Gaut finds most significant, only one was sustained.  Id. at 7-9.  Of the nine lawsuits, four were dismissed in favor of the APD and/or its

---

[8] In a second Supplemental Report dated February 21, 2017, Gaut makes a broad and superficial comparison of the percentage of the population of Annapolis that is black (26%) and the percentage of arrests by race: 55% of those arrested in 2013 were black and 53% of those arrested in 2014 were black.  Gaut asserts that this data supports his opinion that the "Annapolis Police Department exhibited a pattern and practice of police misconduct, including racial discrimination."  ECF No. 25-26 at 1.  There are, of course, other societal factors that might affect crime rates in different communities, and thus generate different arrest rates.

officers, one returned a jury verdict in favor of the officer, two were settled, one was pending at the time Defendants filed their Motion,[9] and one returned a verdict in favor of the plaintiff, but not as to the excessive use of force claim.

Gaut finds it significant that in this last case where the plaintiff obtained a verdict, the verdict was against Defendant Kintop. ECF No. 25-27 at 28 (referencing Bailey v. Kintop, Case No. 0702-0013630-2011 (Dist. Ct. Anne Arundel Cty., Md. Mar. 10, 2014) (ECF No. 24-24)). Gaut cites this as an example "wherein improper police practices resulted in the arrest of an innocent person," based on the court's finding that "Kintop improperly altered an arrest warrant resulting in the wrongful arrest of James Elmer Bailey." Id. The actual facts in Bailey, however, suggest no similarity to the facts at issue here. In Bailey, an assault victim provided Kintop with the name and date of birth of her assailant and described him as black male. A search of departmental records and other data bases revealed that there was only one individual in the Annapolis area with the name James Elmer Bailey, and he was caucasian. Kintop, after consulting with the Assistant State's Attorney's office, changed the race on the arrest warrant from black to white and proceeded to arrest the plaintiff.

---

[9] This case was dismissed on August 1, 2017, for Plaintiff's failure to maintain a current address with the Clerk. Hodges v. Mayor and City of Annapolis, MD, Civ. No. SAG-15-3537, ECF No. 95.

It turns out that the assailant was a black male who happened to have the same name and recorded birthdate as the plaintiff.

On these facts, the district court found that Kintop had falsely arrested the plaintiff, violating his rights under the Fourth Amendment and Articles 24 and 26 of the Maryland Declaration of Rights.  The court, however, found that the claims of excessive force against each of the APD officers named as defendants were "completely groundless" and "wholly without merit."  3/10/2014 Decision and Order in <u>Bailey</u> at 27, 28.  Furthermore, this Court notes that the facts in <u>Bailey</u> actually undermine the conclusion that the City of Annapolis had notice that Kintop harbored any animus against blacks given that he changed the warrant, not from white to black, but from black to white.

Aside from the relatively limited number of sustained excessive force claims, the Court notes that Gaut has provided no details as to any of these claims.  While Gaut claims that "[t]he actions of Annapolis police officers in stopping and detaining Towhee Sparrow <u>exactly mirror</u> the known history of improper police conduct, <u>i.e.</u>, Excessive Force and Abuse of Authority/Racial Language,"  ECF No. 24-18 at 4 (emphasis added), Gaut neither provides nor discusses the facts of any previous incident.

In evaluating excessive force claims under <u>Monell</u>, courts have consistently held that, for previous complaints to give

notice to a municipality of the need to train or supervise in a particular area, those previous complaints must be shown both to have merit and to be based on similar facts.  For example, in Brooks v. Scheib, the Eleventh Circuit held that, even though there had been ten civilian complaints about the defendant officer, the City of Atlanta had no notice of misconduct because the plaintiff "never demonstrated that past complaints of police misconduct had any merit.  Indeed, the number of complaints bears no relation to their validity."  813 F.2d 1191, 1193 (11th Cir. 1987).

Similarly, in Mettler v. Whitledge, 165 F.3d 1197, 1205 (8th Cir. 1999), the plaintiff produced evidence of 15 prior citizen complaints against the two county deputies against whom she was bringing her excessive force claims.  The Eighth Circuit noted that 7 of the complaints against one of the deputies were excessive force claims, but none were sustained after departmental investigation.  Two of the complaints against the other deputy were excessive force claims, and one of those complaints was sustained, in part.  The court affirmed the district court's grant of summary judgment on the plaintiff's Monell claim against the county after noting that the plaintiff "has produced no evidence regarding the factual background of these previous complaints, nor has she shown that the incidents giving rise to these complaints bear any factual similarity to

[the plaintiff's excessive force claim under <u>Monell</u>]." 165 F.3d at 1205. "[T]he mere existence of previous citizens' complaints does not suffice to show a municipal custom of permitting or encouraging excessive force." <u>Id.</u>; <u>see also</u>, <u>Burks v. Beary</u>, 713 F. Supp. 2d 1350, 1358 (M.D. Fla. 2010) ("A plaintiff cannot establish a municipal liability claim when he cannot 'point to any other incidents involving similar facts.'") (quoting <u>Mercado v. City of Orlando</u>, 407 F.3d 1152, 1162 (11th Cir. 2005)).

The Court concludes that Plaintiff has not met his burden of showing that the City of Annapolis had actual or constructive knowledge of an unconstitutional practice or custom in the APD of using excessive force. Accordingly, the Court will grant Defendants' motion as to Count I.

## IV. CONCLUSION

For the above stated reasons, the Court will grant Defendants' Motion as to Count I of the Amended Complaint and as to the False Imprisonment claims against Defendants Kintop and DeFalco in Count VIII. The Motion will be denied as to the remaining claims. A separate Order consistent with this Memorandum will issue.

_____/s/_____
William M. Nickerson
Senior United States District Judge

DATED: August 9, 2017